UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **LATOYA NIXON** | **CIVIL ACTION** |
| **VERSUS** | **NO. 22-379** |
| **VERA CHESTER, ET AL.** | **SECTION: "P" (5)** |

**ORDER AND REASONS**

Before the Court is the Motion to Enforce Settlement Agreement and to Set Evidentiary Hearing Thereon[1] filed by Defendant, Daniel Edwards in his official capacity as the Tangipahoa Parish Sheriff. Plaintiff, Latoya Nixon, opposes the motion.[2] Following the evidentiary hearing on the issues raised in the motion, the parties filed supplemental briefing as ordered by the Court.[3] Having reviewed and considered the motion, the memoranda and materials submitted in connection with same, the testimonial and documentary evidence presented at the evidentiary hearing, and the applicable law, the Court finds the Motion to Enforce Settlement Agreement should be **GRANTED** for the reasons stated herein.

**I. BACKGROUND**

Plaintiff Latoya Nixon instituted this action following an incident at the Tangipahoa Parish jail on February 14, 2021, involving Nixon and two Tangipahoa Parish Sheriff's Office ("TPSO") employees—Deputy Vera Chester and Sergeant Latoya Edwards-Williams.[4] Nixon alleges she was brought to the jail on a charge of driving under the influence.[5] As she was being escorted by Chester and Edwards-Williams to be pat down, the parties exchanged curse words, and Nixon told

---

[1] R. Doc. 44.
[2] R. Doc. 56.
[3] R. Docs. 63, 72.
[4] R. Doc. 1.
[5] *Id.* at ¶ 11.

the officers if she was going to be treated like a dog, then she would act like a dog.[6] Nixon then proceeded to bark and imitate a dog.[7] Nixon alleges she was facing the wall with her hands behind her back when Chester grabbed her by the hair, forcefully pulled Nixon's wig off, and then pushed Nixon's head, causing it to strike the wall.[8] Chester and Edwards-Williams then forced Nixon into a bathroom without a camera, where Nixon alleges the officers punched her approximately three to five times and sprayed her with a chemical agent approximately three times.[9] After exiting the bathroom, Nixon was handcuffed and placed on a bench.[10] Nixon further alleges that while she was sitting on the bench, Chester threw a bag at her on three occasions before eventually walking away.[11]

According to the Complaint, a TPSO detective conducted an internal affairs investigation after the incident and determined that excessive force was used against Nixon.[12] Chester was then criminally charged with simple battery, and her employment with the TPSO was terminated.[13] As of the filing of the Complaint, Nixon did not know whether Edwards-Williams had been criminally charged or whether she was still employed by the TPSO.[14]

Nixon alleges the officers' use of force and chemical agents caused her to experience burning sensations, a black and swollen eye, and bruising.[15] She also alleges that, as of the filing of the Complaint, she continued to suffer from eye "floaters" that impair her vision because of the

---

[6] *Id.* at ¶¶ 12–13.
[7] *Id.* at ¶ 13.
[8] *Id.* at ¶¶ 14–16.
[9] *Id.* at ¶¶ 17–19.
[10] *Id.* at ¶ 21.
[11] *Id.*
[12] *Id.* at ¶¶ 22, 28.
[13] *Id.* at ¶¶ 29–30.
[14] *Id.* at ¶ 31.
[15] *Id.* at ¶ 25.

incident.[16] In addition, she alleges she has suffered emotional distress, pain and suffering, degradation, and invasion of her civil rights.[17]

Nixon asserts Chester and Edwards-Williams, in their individual capacities, are liable to her pursuant to 42 U.S.C. § 1983 for violating her Fourth and Fourteenth Amendment rights.[18] She also asserts state law claims for negligence and battery against Chester and Edwards-Williams as well as Tangipahoa Parish Sheriff Daniel Edwards, in his official capacity.[19]

Defendant Sheriff Edwards, through his counsel of record ("Bryant"), filed the instant motion, arguing the parties properly confected a settlement agreement that resolves all the claims in this matter, and asks the Court to enforce the settlement agreement between the parties.[20] Plaintiff Nixon, through her then-counsel of record ("DeReus"), filed an opposition to the motion.[21] The opposition states that DeReus conferred with Nixon prior to submitting the opposition and that DeReus believes the opposition encapsulates Nixon's position on the issue. DeReus subsequently withdrew from representing Nixon in this matter, and Plaintiff Nixon is now proceeding *pro se*.[22]

At the time the instant motion was filed, this case was pending before Chief Judge Brown, who held an evidentiary hearing on the issues raised in the motion and opposition.[23] The parties then submitted supplemental briefing following the evidentiary hearing.[24] Shortly thereafter, this case was transferred to the undersigned district judge.[25]

---

[16] *Id.*
[17] *Id.* at ¶ 26.
[18] *Id.* at ¶¶ 3, 35–45.
[19] Id. at ¶¶ 3, 46–65.
[20] R. Doc. 44.
[21] R. Doc. 56.
[22] R. Doc. 70.
[23] R. Doc. 58.
[24] R. Docs. 63, 72.
[25] R. Doc. 73.

3

Based on the evidence presented at the evidentiary hearing, it is undisputed that on Tuesday, March 21, 2023, DeReus sent an email to Bryant that said, "I have authorization from Ms. Nixon to resolve this matter for $70,000.00."[26] And on Wednesday, March 22, 2023, at 10:40 a.m., Bryant responded, "We conditionally accept and agree to a full and complete settlement at $70,000.00 with each party to bear their own costs. The condition, of course, being the approval of the board as you and I discussed. I anticipate that we'll have a quorum by Friday or Monday."[27] Shortly thereafter, at 11:58 a.m., DeReus emailed the chambers of the magistrate judge assigned to this case stating, "The parties in this action have reached compromise, subject to approval vote by the Sheriff's Insurance Board. The parties would like to put the settlement on the record before a court reporter. From my call with Bianca, it sounds like it might be possible to have a telephone conference tomorrow at 11:00 a.m. to put the terms on the record."[28] The Sheriff's Insurance Board approved the settlement on Thursday, March 23, 2023,[29] but, for the reasons explained below, the terms of the settlement were never put on the record.

On March 22, after receiving the acceptance email from Bryant, DeReus sent a text message to Nixon at 10:44 a.m., stating "Great news. Give me a call when you are available."[30] At some point between 10:44 a.m. and 12:34 p.m., Nixon called DeReus, and he relayed to her that the defendants agreed to settle the case for $70,000.00 and that there would be a call with the magistrate judge to put the terms of the agreement on the record. According to DeReus, based on his impression of this conversation, Nixon was satisfied with the settlement amount, and everything seemed fine. Then, at 12:34 p.m., DeReus sent a follow-up text message to Nixon,

---

[26] R. Doc. 59-1.
[27] R. Doc. 59-2. Although Bryant was counsel of record for Sheriff Edwards only, Bryant testified he had been authorized to negotiate settlement on behalf of all defendants in this matter.
[28] R. Doc. 59-3.
[29] R. Doc. 59-5.
[30] R. Doc. 59-4.

4

letting her know that the call with the magistrate judge would likely be the next day (Thursday) at 11:00 a.m.[31] Nixon then responded to DeReus in a series of text messages, first stating she would call DeReus prior to the call with the magistrate judge, then stating "I really wanna [sic] say I'm not settling out unless they throw my ticket out too[.]" She then explained she had multiple tickets in Ponchatoula, Tickfaw, and Hammond[32] and said she was "only signing if they throw [her] ticket[s] out too" because it would be "of no cost" to the defendants.[33] Nixon then followed up saying she also wanted Edwards-Williams "pick[ed] up and arrested" before she would "sign any paper work [sic]."[34]

The timeline of the following events is less clear, but, after receiving the text messages from Nixon, DeReus reached out to Bryant to discuss Nixon's requests. Bryant explained that the defendants could not do what Nixon was asking, and DeReus asked if Bryant would explain those reasons to Nixon directly. Bryant agreed, and DeReus, Bryant, and Nixon all held a phone call during which Bryant provided those reasons to Nixon. Upon learning that defendants could not assist her with her tickets in the way she wished, Nixon modified her request and said she would not settle unless the defendants increased the settlement amount to cover the costs she would otherwise have to pay to resolve the tickets. Bryant explained to Nixon that it was the defendants' position that the parties had already reached an agreement to resolve this matter and, therefore, he would be filing a motion to enforce the settlement agreement.

Given Nixon's belief that this matter is not settled until she personally executes a settlement agreement and, thus, that she still has the right to negotiate for additional relief, the parties have

---

[31] *Id.*
[32] Nixon was referring to tickets for traffic violations she received in cities within Tangipahoa Parish but that were unrelated to this lawsuit.
[33] R. Doc. 59-4.
[34] *Id.*

not taken any additional steps towards consummation of the settlement agreement the defendants contend the parties entered into on March 22, 2023.

## II. LAW AND ANALYSIS

The Court has the inherent power to recognize, encourage, and enforce settlement agreements reached by the parties.[35] Defendants contend, and Plaintiff does not contest, that federal law governs this dispute. Under federal law, a settlement agreement is a contract.[36] The federal common law of contracts "uses the core principles of common law of contracts that are in force in most states."[37] For a valid contract to exist under federal law, there must be an offer, acceptance, consideration, and a meeting of the minds on all essential terms.[38] Federal law does not require settlement agreements to be reduced to writing.[39] Thus, Nixon's position that the settlement agreement is not enforceable unless she personally signs a written agreement is incorrect.

Nixon does not challenge the validity of the settlement agreement on the basis that any of elements of contract formation have not been satisfied.[40] Rather, the issue appears to be whether DeReus, her counsel of record at the time, had the requisite authority to settle her claims. It is well-settled that "an attorney of record is presumed to have authority to compromise and settle

---

[35] *Bell v. Schexnayder*, 36 F.3d 447, 449-50 (5th Cir. 1994) (citing *Cia Anon Venezolana de Navegacion v. Harris*, 374 F.2d 33, 35–36 (5th Cir. 1967)).
[36] *Guidry v. Halliburton Geophysical Servs., Inc.*, 976 F.2d 938, 940 (5th Cir. 1992).
[37] *Smith v. United States*, 328 F.3d 760, 767 n.8 (5th Cir. 2003).
[38] *See In re Deepwater Horizon*, 786 F.3d 344, 355–59 (5th Cir. 2015).
[39] *E.E.O.C. v. Phillip Servs. Corp.*, 635 F.3d 164, 167 (5th Cir. 2011) (citing *Fulgence v. J. Ray McDermott & Co.*, 662 F.2d 1207, 1209 (5th Cir. 1981)).
[40] The Court recognizes that at the evidentiary hearing Chief Judge Brown requested supplemental briefing regarding the condition of the approval vote of the Sheriff's Insurance Board and whether that condition had any effect on the timing of the contract formation. The Court agrees with the defendants' position that the record reveals the parties intended the approval vote to be a condition precedent to performance, as opposed to a condition precedent to formation, and therefore the contract was formed on March 22, 2023, when Bryant accepted the offer to settle the claims in this lawsuit for $70,000.00. *See In re Deepwater Horizon*, 786 F.3d at 361 ("A condition precedent is either an act of a party that must be performed or a certain event that must happen before a contractual right accrues or a contractual duty arises. The failure of a condition to occur excuses performance by the party whose performance is dependent on its occurrence.") (cleaned up).

litigation of his client."[41] To rebut this presumption, the party challenging the attorney's authority bears the burden of proving by affirmative evidence that the attorney had not been given express authority to settle.[42] Based on the record before the Court, Nixon has failed to carry her burden.

At the evidentiary hearing, Nixon's timeline of events was unclear and at times contrary to the documentary evidence in the record. Despite repeated questions to clarify when she had certain conversations with DeReus and what she recalled saying during those conversations—which were asked in an effort to determine whether she spoke to DeReus on March 21 before he sent the email to Bryant stating he had authorization to resolve the matter for $70,000.00—Nixon kept referring to the phone calls and conversations held on March 22 and the days following. DeReus, however, testified that he did call Nixon on March 21 prior to sending the email to Bryant.[43] The Court finds this testimony persuasive. Indeed, Nixon does not deny that the parties held this conversation or that DeReus spoke to her about settling with the defendants for $70,000.00. Instead, she merely contends that she did not realize that there would not be further opportunity to negotiate after the offer was made.

The record is unclear regarding exactly what words were exchanged between DeReus and Nixon during the March 21 conversation, but three things are clear. First, DeReus initiated the call with Nixon on March 21 for the purpose of determining whether he had authority to settle the case for $70,000.00. Second, he had no doubt in his mind at the conclusion of the conversation that Nixon had given him such authority. Third, after his conversation with Nixon, DeReus sent the email to Bryant stating, "I have authorization from Ms. Nixon to resolve this matter for

---

[41] *See, e.g., Quesada v. Napolitano*, 701 F.3d 1080, 1083 (5th Cir. 2012) (citing *Mid-South Towing Co. v. Har-Win, Inc.*, 733 F.2d 386, 390 (5th Cir. 1984)).
[42] *See Mid-South Towing Co.*, 733 F.2d at 390–91.
[43] This testimony is also supported by Nixon's version of events as stated in both memoranda she provided to the Court with respect to the instant motion. *See* R. Docs. 56, 72.

$70,000.00." Although DeReus's testimony that he believed he had been given authority to settle the case is not conclusive of whether he was actually given such authority, it is highly probative.[44] And the Court finds that DeReus's belief that he had been given express authority is substantiated by the fact that DeReus spoke to Nixon almost immediately after Bryant sent the acceptance email, and Nixon did not express any issue or dissatisfaction with the terms of the settlement agreement at that time. Indeed, it was not until DeReus sent the second text message about putting the terms of the agreement on the record that Nixon began expressing an unwillingness to go forward with the settlement agreement without additional relief.

Ultimately, Nixon has not put forth any affirmative evidence that she did not provide DeReus with express authority to settle this matter for $70,000.00. To the contrary, the record before the Court appears to support the presumption that DeReus did have authority to settle. Nixon's challenge to the validity and enforceability of the settlement agreement therefore fails.

### III.   CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that the Motion to Enforce Settlement Agreement (R. Doc. 44) is **GRANTED**.

Because the settlement agreement resolves Plaintiff's claims against all defendants in this matter, **IT IS FURTHER ORDERED** that the Motion to Set Aside Entry of Default (R. Doc. 39) and the Motion for Leave to File Answer Out of Time (R. Doc. 49), filed by Defendant Latoya Edwards-Williams, are **DENIED AS MOOT**.

New Orleans, Louisiana, this 30th day of September 2024.

_____
**DARREL JAMES PAPILLION**
**UNITED STATES DISTRICT JUDGE**

---

[44] *See Mid-South Towing Co.*, 733 F.2d at 391.